**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| *IN RE:* HAIR RELAXER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 3060 |

**DABUR INTERNATIONAL LIMITED AND NAMASTÉ
LABORATORIES, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407
<u>FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS</u>**

Defendants Dabur International Limited ("Dabur")[1] and Namasté Laboratories, LLC ("Namasté") respectfully submit this response in opposition to Plaintiffs' motion for transfer of actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings.

## **INTRODUCTION**

The proposed multidistrict litigation seeks to consolidate a small number of actions filed against 14 separate Defendants that manufactured, marketed, or sold a variety of hair-relaxer products allegedly containing endocrine-disrupting chemicals ("EDCs") that Plaintiffs claim caused them physical or economic harm. The proposed industry-wide MDL is unnecessary and would not fulfill Section 1407's goal of promoting just and efficient pretrial proceedings.

Only 11 hair-relaxer actions are currently before the Panel.[2] These actions are currently pending in six federal courts—five in the Northern District of Illinois, two in the Southern District of Georgia, and the remaining in the Southern District of New York, the Northern District of California, the Eastern District of New York, and the Southern District of Illinois, respectively. Procedural mechanisms exist that permit consolidating the separate actions for pretrial discovery purposes within their respective districts. Given the small number of actions residing in only a handful of federal courts, the parties will be able to coordinate pretrial efforts among themselves to avoid inefficiencies such as duplicative discovery.

---

[1] Plaintiffs define "Dabur" to include two entities, "Dabur International Ltd." and "Dabur USA, Inc." Dabur USA Inc. is not an existing entity. Dabur International Limited responds on behalf of itself and no other entity. In so responding, Dabur International Limited states that it is a foreign entity incorporated in the Isle of Man. Both Dabur International Limited and Namasté Laboratories, LLC expressly reserve all rights and defenses including those related to personal jurisdiction and service of process.

[2] Plaintiffs' initial motion sought to consolidate nine actions. (JPML, MDL No. 3060, Dkt. 1-2.) On December 7, 2022, Namasté tagged two additional actions pursuant to Judicial Panel on Multidistrict Litigation Rule 6.2(d). (JPML, MDL No. 3060, Dkt. 30.)

1

Centralization is not only unnecessary but also improper because individualized issues far exceed whatever factual commonalities may exist across the actions. Indeed, Defendants in these actions are competitors that manufactured, marketed, or sold different hair-relaxer products—at different points in time from 1975 to present—using different manufacturing processes, suppliers, quality-control procedures, packaging, and advertising. Plaintiffs' individual actions will be focused on facts specific to each Defendant, including the presence and amount of EDCs in its products, if any, the results of testing those products, and the individual marketing strategies employed. And the same is true with respect to Plaintiffs—each of whom allege various physical or economic harms arising from alleged use or purchase of different products at different times over the last 50 years. Because individual issues regarding personal injury and causation specific to each Plaintiff predominate, centralizing these actions would not facilitate pretrial efforts, but rather would create inefficiencies and waste.

If, however, the Panel nonetheless decides to centralize the underlying actions into a single, industry-wide MDL, Namasté and Dabur respectfully suggest that the Panel assign the proceedings to the Honorable Valerie E. Caproni in the Southern District of New York, or if it prefers to centralize in the Northern District of Illinois, to the Honorable John J. Tharp Jr. Both judges are distinguished, capable jurists currently presiding over hair-relaxer cases pending in their respective jurisdictions, and both localities are geographically central locations that would be convenient for the parties and their counsel.

**BACKGROUND**

On October 17, 2022, Che-Jung Chang *et al*. published the results of an eight-year study purporting to find an association between the participants' use of various hair-straightening products and uterine cancer, while noting that additional research was needed. (*See* Ex. A, Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*,

2

Journal of the National Cancer Institute, Oct. 17, 2022 (the "Chang Study").) The Chang Study noted that hair-product use is a potential exposure pathway to various EDCs and has been associated with hormone-sensitive cancers including breast and ovarian cancer. Although the researchers found an association between straightening-product use and uterine cancer, they did not tie their findings to any specific brands or products to identify specific chemicals contributing to uterine cancer; they instead relied on survey results of participants with pre-existing cancer in their family histories who self-reported the categories of various hair products they used (*e.g.*, dyes, bleach, relaxers, highlights) and their frequency of use (*e.g.*, did not use, 1–2 times per year, every 5–8 weeks). Not surprisingly, the researchers concluded that additional studies are needed for a number of reasons, including to understand the effect of various potential confounding factors, to confirm the researchers' findings in different populations, and to identify chemical ingredients. (*See, e.g.,* Chang Study at 8 ("More research is warranted to confirm our novel findings in different populations, particularly in African American and/or Black women because of the high prevalence of straightener use, and to evaluate the potential contribution of hair products to health disparities in uterine cancer. Future efforts are also needed to identify the chemical ingredients, which might result in the elevated rates.").)

Four days after the Chang Study was published, Plaintiffs filed actions in the Southern District of New York (*Terrell v. L'Oréal USA, Inc. et al.*), the Northern District of Illinois (*Mitchell v. L'Oréal USA, Inc. et al.*), and the Northern District of California (*Bhonopha v. L'Oreal USA, Inc. et al.*) against more than a dozen entities in the beauty and personal-care industry that manufacture, market, or sell a variety of hair-relaxer products. Additional lawsuits followed— including four more actions filed in the Northern District of Illinois (*Gordon v. L'Oréal USA, Inc. et al.*; *Smith v. L'Oréal USA, Inc. et al.*; *Grant v. L'Oréal USA, Inc. et al.*; and *Williams et al. v.*

*L'Oréal USA, Inc. et al.*) and two actions filed in the Southern District of Georgia (*Gamble v. Strength of Nature Global, LLC* and *Lee v. Strength of Nature Global, LLC*). On November 15, 2022—less than a month after the Chang Study was published—Plaintiffs filed the instant motion to coordinate or consolidate those nine actions in the Northern District of Illinois. (JPML, MDL No. 3060, Dkt. 1.) And on December 7, 2022, two additional actions—one pending in the Southern District of Illinois (*Rose & Dillon v. Dabur International Ltd. d/b/a Dabur USA, Inc., et al.*) and the other pending in the Eastern District of New York (*Spencer v. Strength of Nature, LLC, et al.*)—were tagged as potentially related actions. (JPML, MDL No. 3060, Dkt. 30.)

Across these 11 complaints, Plaintiffs name 14 separate entities as Defendants, alleging that they "developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold" a variety of hair-relaxer brands, "including but not limited to" Just for Me, Organic Root Stimulator ("ORS") Olive Oil Relaxer, Dark & Lovely, Carefree, Optimum, Motions, Soft & Beautiful, Revlon, Crème of Nature, Africa's Best, African Pride, and Cantu Shea Butter Relaxer. (*See, e.g.*, Ex. B, *Bhonopha* Compl. ¶ 10; Ex. C, *Grant* Compl. ¶ 14; Ex. D, *Smith* Compl. ¶ 12; Ex. E, *Terrell* Compl. ¶ 12.) As Plaintiffs acknowledge, some of those brands include several different products. (*See, e.g.*, Ex. F, *Williams et al.* Compl. ¶ 14 (listing six different Dark & Lovely products).)

Plaintiffs assert that hair-relaxer products "can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body," which allegedly include various EDCs called "phthalates" as solvents and stabilizers. (JPML, MDL No. 3060, Dkt. 1-1 at 3.) Plaintiffs further assert that various studies tie EDCs to different kinds of adverse effects on the male and female reproductive systems, including "inducing endometriosis, developmental

4

abnormalities, reproductive dysfunction and infertility, various cancers, and metabolic syndrome."
(*Id.*)

Relying on these studies, Plaintiffs claim that certain of Defendants' hair-relaxer products caused Plaintiffs different physical harms after they used the products starting at different ages and for different durations:

| Plaintiff | Products | Age of First Use | Duration | Harm |
|---|---|---|---|---|
| Mitchell | Motions<br>Dark & Lovely<br>ORS Olive Oil Relaxer | 10 | 2000–2022 | Uterine Cancer |
| Gordon | Dark & Lovely<br>Just for Me | 13 | 1983–2013 | Breast Cancer<br>Uterine Cancer |
| Smith | Dark & Lovely<br>Just for Me<br>Cantu Shea Butter Relaxer | 10 | 1987–2017 | Uterine Cancer<br>Endometriosis |
| Grant | Carefree<br>Optimum<br>Dark & Lovely<br>Just for Me<br>Motions<br>Africa's Best | 18 | 1982–2019 | Uterine Cancer |
| Bhonopha | Just for Me<br>Dark & Lovely<br>ORS Olive Oil Relaxer | 13 | 1996–2008 | Fibroids |
| Terrell | Motions<br>Dark & Lovely<br>Soft & Beautiful<br>Optimum Care<br>Revlon<br>Crème of Nature | 8 | 1975–1997 | Uterine Cancer |
| Gamble | Just for Me<br>Motions<br>ORS Olive Oil Relaxer | 6 | 1994–2012 | Fibroids<br>Endometriosis |
| Lee | Dark & Lovely<br>Optimum Care<br>Motions<br>Just for Me<br>ORS Olive Oil Relaxer<br>African Pride | 14 | 1993–2013 | Fibroids |
| Spencer | Soft & Beautiful<br>Motions<br>ORS Olive Oil Relaxer | 16 | 1998–2014 | Fibroids |

5

It is not clear from the complaints which specific products were used, at what times, or for how long over the nearly 50 years of alleged use. Moreover, two of the complaints allege no physical harm at all, but instead are consumer class-actions alleging economic harm and seeking injunctive relief and restitution. (Ex. F, *Williams et al.* Compl. ¶ 1; Ex. G, *Rose & Dillon* Compl. ¶ 1.)

Of the 11 actions currently before the Panel, Namasté is named in six, and Dabur (a foreign company with no commercial operations in the United States) is named in three. Both Dabur and Namasté are named in actions pending in the Northern District of Illinois (*Mitchell v. L'Oréal USA, Inc. et al.*), the Northern District of California (*Bhonopha v. L'Oreal USA, Inc. et al.*), and the Southern District of Illinois (*Rose & Dillon v. Dabur International Ltd. d/b/a Dabur USA, Inc., et al.*); and Namasté is additionally named in actions pending in the Southern District of Georgia (*Gamble v. Strength of Nature Global, LLC et al.* and *Lee v. Strength of Nature Global, LLC et al.*) and the Eastern District of New York (*Spencer v. Strength of Nature, LLC, et al.*). In these actions, Plaintiffs attribute one product—ORS Olive Oil Relaxer—to Namasté and/or Dabur.

**ARGUMENT**

**I.    A SINGLE MDL IS NOT NECESSARY TO COORDINATE PRETRIAL PROCEEDINGS.**

The Panel has repeatedly "emphasized that 'centralization under Section 1407 should be the last solution after considering review of all other options.'" *In re: Baby Food Mktg., Sales Pracs. & Prod. Liab. Litig.*, 544 F. Supp. 3d 1375, 1377 (J.P.M.L. 2021) (quoting *In re: Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011)). This is especially so when the defendants that would be joined together are each "named in only a minority of actions." *In re Ambulatory Pain Pump-Chondrolysis Prod. Liab. Litig.*, 709 F. Supp. 2d 1375, 1377 n.2 (J.P.M.L. 2010). For such cases, Congress and the courts have adopted narrower

6

procedural rules to avoid duplicative discovery or inconsistent pretrial process, including transfer under 28 U.S.C. § 1404(a) and consolidation under Federal Rule of Civil Procedure 42. *E.g.*, *Baby Food*, 544 F. Supp. 3d at 1377–78 ("We have repeatedly observed that transfer under Section 1404 or the first-to-file doctrine is preferable to 1407 centralization. We believe it better to allow the parties attempts to self-organize play out before centralizing any part of this litigation."); *In re: Gerber Probiotic Prod. Mktg. & Sales Pracs. Litig.*, 899 F. Supp. 2d 1378, 1380–81 (J.P.M.L. 2012) ("[T]ransfer under Section 1404(a)—where appropriate—can result in a more streamlined action, without the procedural necessity of remand in the transferor court that is required under Section 1407."). These procedures preserve the inherently individual nature of the core disputes while enabling procedural pretrial efficiencies.

The 11 actions before this Panel should remain individualized. Five of those cases have been filed in the Northern District of Illinois; two cases have been filed in the Southern District of Georgia, both before Judge R. Stan Baker; and the remainder are spread across only a handful of districts. Moreover, most Defendants are named in just a few of the actions: Namasté is named in six, Dabur is named in three, and Parfums De Couer, Ltd. and House of Cheatham are each named in just one. As discussed below, these cases each involve highly individual issues; to the extent there are also some common questions of law or fact, the courts hearing them are free to consolidate the matters as appropriate. *E.g.*, *In re Title Ins. Real Est. Settlement Procs. Act (RESPA) & Antitrust Litig.*, 560 F. Supp. 2d 1374, 1376 (J.P.M.L. 2008) (denying centralization because the parties could seek "consolidation of actions pending in multiple districts with the same state"); *In re FICO Antitrust Litig. Related Cases*, No. 1:20-cv-02114, 2021 WL 4478042 (N.D. Ill. Sept. 30, 2021) (granting the consolidation of ten separate proposed antitrust class actions due to relatedness of issues). Similarly, should a court find that the matter before it is ill-suited for its

7

jurisdiction, it may transfer the matter to a more appropriate forum. 28 U.S.C. § 1404(a). Given the courts' ability to coordinate these proceedings, centralization is not warranted.

## II. INDIVIDUALIZED ISSUES OUTWEIGH COMMON QUESTIONS AND RENDER CENTRALIZATION INEFFICIENT AND WASTEFUL.

While centralization here is not necessary, it also would be improper. Section 1407 permits transferring civil actions involving one or more common questions of fact to a district for coordinated or consolidated pretrial proceedings when the Panel determines that such transfer "will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). When "individualized facts … predominate over the common factual issues in [the] litigation," as they do here, the Panel has declined to centralize cases. *See In re: Narconon Drug Rehab. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 84 F. Supp. 3d 1367, 1368 (J.P.M.L. 2015); *see also Baby Food*, 544 F. Supp. 3d at 1376–77 (declining to create industry-wide MDL against baby food manufacturers because "each defendant manufactures, markets, and distributes its own baby food products subject to different manufacturing processes, suppliers, and quality control procedures" and defendant-specific facts would predominate over common factual questions); *In re Belviq (Lorcaserin HCl) Prod. Liab. Litig.*, 555 F. Supp. 3d 1369, 1370 (J.P.M.L. 2021) (declining to centralize cases against manufacturer of Belviq because individualized factual issues concerning causation and the plaintiffs' broad range of alleged harm from taking the drug predominate). In the actions currently before the Panel, individualized issues concerning the Defendants and the hair-relaxer products attributed to them as well as the Plaintiffs and their alleged personal injuries and alleged causation predominate, and centralizing these actions would be inefficient and wasteful.

### A. Unique Defendants and Products Render Industry-Wide Centralization Inappropriate.

This Panel has explained that it is "typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured, and sold similar products." *In re Yellow Brass Plumbing Component Prod. Liab. Litig.*, 844 F. Supp. 2d 1377, 1378 (J.P.M.L. 2012); *see also, e.g.*, *In re Credit Card Payment Prot. Plan Mktg. & Sales Pracs. Litig.*, 753 F. Supp. 2d 1375, 1375–76 (J.P.M.L. 2010) (declining to centralize "industry-wide litigation" involving competing defendants that "offered several different products, which were marketed in different ways"); *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, 867 F. Supp. 2d 1341, 1342 (J.P.M.L. 2012) (similar). Indeed, the Panel has recognized that "creating an industry-wide MDL" against competing defendants typically generates "few efficiencies," particularly when the "factual commonality across the actions appears to be superficial at best." *In re Secondary Ticket Mkt. Refund Litig.*, 481 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020).

Just last year, this Panel denied a motion to create an industry-wide MDL that was similar to the one Plaintiffs propose here. In *Baby Food*, the movants alleged that manufacturers of baby foods knowingly sold products containing heavy metals yet marketed these products as healthy and as not containing harmful ingredients. 544 F. Supp. 3d at 1375. Although the Panel observed that the actions were similar at a general level and were prompted by a common Congressional investigation into the defendants' products, it found that "each defendant manufactures, markets, and distributes its own baby food products subject to different manufacturing processes, suppliers, and quality control procedures," and thus, the claims against each defendant were "likely to rise or fall on facts specific to that defendant, such as the amount of heavy metals in its products, the results of its internal testing, if any, and its marketing strategies." *Id*. at 1376–77. Accordingly, the Panel found the proposed industry-wide MDL to be inappropriate. *Id*. at 1377; *see also In re*

*Proton-Pump Inhibitor Prod. Liab. Litig.*, 273 F. Supp. 3d. 1360 (J.P.M.L. 2017) (declining to form industry-wide MDL where the defendants were competitors and discovery would be defendant-specific); *In re: Shoulder Pain Pump-Chondrolysis Prod. Liab. Litig.*, 571 F. Supp. 2d 1367 (J.P.M.L. 2008) (declining to create MDL with numerous different manufacturers of shoulder pain pumps and different anesthetic drugs at issue in light of individualized issues of liability and causation); *In re: Children's Pers. Care Prod. Liab. Litig.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009) (declining to centralize actions against a diverse group of defendants with claims involving "[m]ore than ten different baby products with differing formulations").

The Panel's reasoning is equally applicable here. Plaintiffs' proposed MDL would involve at least 12 different hair-relaxer brands (some of which contain multiple different products) that allegedly were "developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, ***and/or*** sold" by 14 separate Defendants named in some, but not all, of the 11 actions currently before the Panel. As in *Baby Food*, Defendants here are competitors that manufacture, market, or distribute their own hair-relaxer products using different manufacturing processes, suppliers, quality-control procedures, packaging, and advertising for their products, which were allegedly sold and used as early as 1975 and as late as this year. Moreover, Plaintiffs' individual actions will likely "rise or fall on facts specific to [each] defendant, such as the amount of [EDCs] in its products, [if any,] the results of its internal testing, if any, and its marketing strategies." *See Baby Foods*, 544 F. Supp. 3d at 1376. Given these defendant-specific issues, few, if any, efficiencies would be gained through an MDL.

Plaintiffs' alleged facts and their cited case law fail to show otherwise. Regarding the facts, the primary commonality alleged in Plaintiffs' motion is that Defendants' products contain EDCs. (*See* JPML, MDL No. 3060, Dkt. 1-1 at 1.) According to Plaintiffs, the purported presence of

EDCs in Defendants' products creates common questions of fact across actions, including "[w]hether Defendants' hair relaxer products contain EDCs," "[w]hether hair relaxer products containing EDCs are harmful when absorbed into the human body," and "[w]hether Defendants knew or should have known of publicly-available studies demonstrating the adverse impact EDCs have on the male and female reproductive systems." (*See id*. at 5.) A closer look, however, reveals that these are not common factual questions at all: they're inherently Defendant-specific. For example, whether the 12 hair-relaxer brands at issue in these 11 complaints contain EDCs—and how much they contain—will depend on the results of testing each Defendant's individual products over the years they were sold. Whether hair-relaxer products containing EDCs are harmful when absorbed in the human body—and if so, in what quantity—also depends on the results of that testing, as well as whether each Defendant's products contained chemicals that "cause[d] burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body" (*id*. at 3) to determine if they were absorbed at all. And whether Defendants knew about publicly available studies regarding the effects of EDCs on male and female reproductive systems is a Defendant-specific inquiry on its face. "Much of the discovery and pretrial practice"—including written discovery, depositions of fact witnesses and corporate representatives, expert retention and exclusion motions, and motions *in limine*—"will be defendant-specific." *Baby Foods*, 544 F. Supp. 3d at 1375, 1376–77.

While the general question of whether EDCs are harmful is common across the actions, the answer to that question resolves very little. For Plaintiffs to establish liability here, they must point to each Defendant's unlawful or inappropriate conduct in manufacturing, marketing, or selling hair-relaxer products that contained EDCs, and demonstrate that such conduct caused harm.

That inquiry is entirely Defendant-specific, and centralizing actions into an industry-wide MDL would create few if any efficiencies.

Plaintiffs' cited authority likewise does not support centralization here. Indeed, many of Plaintiffs' cases concern a single defendant or affiliated entities, or conduct arising from a single event—not competitors whose individualized, allegedly improper conduct spanned decades, like those in the underlying actions here. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 24 F. Supp. 3d 1361 (J.P.M.L. 2014) (affiliated defendants); *In re Viagra (Sildenafil Citrate) Prod. Liab. Litig.*, 176 F. Supp. 3d 1377 (J.P.M.L. 2016) (single defendant); *In re: Natrol, Inc. Glucosamine/Chondroitin Mktg. & Sales Pracs. Litig.*, 26 F. Supp. 3d 1392 (J.P.M.L. 2014) (single defendant); *In re: Enfamil Lipil Mktg. & Sales Pracs. Litig.*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) (single defendant); *In re Pineapple Antitrust Litig.*, 342 F. Supp. 2d 1348, 1349 (J.P.M.L. 2004) (affiliated defendants); *In re Enron Corp. Sec., Derivative & ""ERISA" Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (single event involving Enron's conduct); *In re Air Crash at Dallas/Fort Worth Airport on Aug. 2, 1985*, 623 F. Supp. 634 (J.P.M.L. 1985) (single event). And where Plaintiffs do cite cases involving multiple, non-affiliated defendants that do not arise from a single event, many of those cases involved industry-wide conspiracy allegations, which are not alleged in any of the actions here. *See In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388 (J.P.M.L. 2014); *In re: Optical Disk Drive Prod. Antitrust Litig.*, 701 F. Supp. 2d 1382 (J.P.M.L. 2010); *see also Baby Food*, 544 F. Supp. 3d at 1377 (finding that the plaintiffs "overwhelmingly d[id] not assert claims of an industry-wide conspiracy or coordination between defendants").

Finally, it should be noted that industry-wide MDLs are particularly improper when "[n]o defendant is sued in all actions, and several entities … are named in, at most, two or three of them."

*In re: Table Saw Prod. Liab. Litig.*, 641 F. Supp. 2d 1384 (J.P.M.L. 2009). In the actions underlying this proposed MDL, no Defendant is named in all of them, and some Defendants—like Dabur, PDC Brands, Parfums De Coeur, Ltd., Beauty Bell Enterprises, LLC d/b/a House of Cheatham, Inc., and House of Cheatham, LLC—are named in three or fewer.

Because individualized, Defendant-specific issues predominate here, the Court should decline Plaintiffs' invitation to form an industry-wide MDL.

### B. Unique Plaintiffs and Individualized Personal Injury Claims Also Render Centralization Inappropriate.

Individualized issues also predominate with respect to Plaintiffs and their alleged injuries. Indeed, across the underlying actions, Plaintiffs allege unique, Plaintiff-specific physical and economic harm with little, if any, crossover. Such actions are ill-suited for an MDL.

The Panel routinely declines to centralize cases where "the injuries alleged in each case appear to be highly plaintiff-specific." *In re Linear Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, 341 F. Supp. 3d 1381, 1382 (J.P.M.L. 2018); *In re Electrolux Dyer Prod. Liab. Litig.*, 978 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013) (denying centralization where "individualized facts concerning the circumstances of each fire, including installation, repair, and maintenance, will predominate over the common factual issues raised by plaintiffs"); *In re: Spray Polyurethane Foam Insulation Prod. Liab. Litig.*, 949 F. Supp. 2d 1364, 1364 (J.P.M.L. 2013) ("On the present record, it appears that individualized facts concerning the chemical composition of the different products, the training and practices of each installer, and the circumstances of each installation at each residence will predominate over the common factual issues alleged by plaintiffs."). Instead, the Panel has recommended individualized treatment within the initial courts, with those courts adopting "various alternatives to transfer to minimize the potential for duplicative discovery and/or inconsistent pretrial rulings" as appropriate. *Spray Polyurethane*, 949 F. Supp. 2d at 1364–65.

Recently, the Panel was asked to centralize 13 actions pending across 10 districts based on the weight-loss medication Belviq. *Belviq*, 555 F. Supp. 3d at 1369. There, "[t]he individual plaintiffs claim[ed] that they developed a variety of different cancers, including breast cancer, colorectal cancer, thyroid cancer, and cancer of the parotid gland, as a result of taking Belviq." *Id.* at 1370. Even though the matter involved just one product and just one manufacturer, the Panel declined to centralize the cases because of the individual character of each plaintiff's harm: "The record before us indicates that individualized factual issues concerning causation will predominate and diminish the potential to achieve significant efficiencies in an MDL. The actions allege a broad range of cancers without indicating the mechanism by which Belviq allegedly causes the various cancers. Additionally, some plaintiffs allegedly took Belviq for as little as a month or two, while others claim to have taken it for several years or more." *Id.*

The Panel's reasoning is even more compelling here. Plaintiffs allege a variety of injuries, including uterine fibroids, uterine cancer, breast cancer, endometriosis, infertility, and miscarriage, as well as pain and suffering. (*Compare, e.g.*, ex. B, *Bhonopha* Compl. ¶ 13, *with* Ex. H, *Mitchell* Compl. ¶ 1 and Ex. I, *Gamble* Compl. ¶ 202.) The Plaintiffs' injuries purportedly arose from using various hair-relaxer products over different time frames, beginning at different ages, and with different frequencies of use. (*Compare, e.g.*, Ex. H, *Mitchell* Compl. ¶ 191 (using various hair-relaxer products for 22 years from 2000 through 2022 with use "exactly as instructed"), *with* Ex. I, *Gamble* Compl. ¶ 197 (using various hair-relaxer products with "continuous exposure" for 18 years from 1994 to 2012).) Other Plaintiffs do not have medical-related injuries at all. (*E.g.*, Ex. G, *Rose & Dillon* Compl. ¶ 1.) These issues are further compounded by the fact that each Plaintiff

14

used distinct products manufactured by distinct Defendants, all of which relied on unique marketing and instruction materials.[3]

For each Plaintiff's claims against Namasté and/or Dabur, any liability will be predicated on the answers to at least these questions: (1) whether the Plaintiff used a Namasté or Dabur product; (2) which Namasté or Dabur product was used; (3) when that product was used; (4) how frequently the product was used; (5) what injury was suffered; (6) whether use of the product was the cause-in-fact of that injury; (7) what labeling and instructions that product included; and (8) whether the instructions on the product label were followed. This mirrors the situation in *Belviq*, where the Panel determined centralization to be inappropriate. *See also In re: Abbott Labs., Inc., Similac Prod. Liab. Litig.*, 763 F. Supp. 2d 1376, 1376-77 (J.P.M.L. 2011) (declining to centralize a matter where "discovery and motion practice may be expected to concern (1) the particular product each person purchased, (2) any injuries that consumption of the product causes, (3) whether the product contained [the allegedly harmful substance]; (4) what advertising or other representations were made to each particular plaintiff."). With these questions at the forefront of each claim—***and against each Defendant and its products***—any centralization will quickly devolve into hundreds of one-off disputes between the individual Plaintiff and individual Defendant. The mere fact that the complaints generally allege that each Plaintiff used a hair relaxer

---

[3] The Chang Study highlights these distinctions. The study surveyed generally the use of "straighteners, relaxers, or pressing products," among other products, and observed a 1.18% higher risk difference for the development of uterine cancer in women who ever used a straightener product, but different risk rates based on frequency of use. (Chang Study at 3.) Such research is of limited value here. Neither *Bhonopha*, *Gamble*, nor *Lee* allege a diagnosis of uterine cancer—accordingly, the research is of little help. And even in *Mitchell*, where uterine cancer is alleged, the report does not identify which products the participants used.

15

of some brand for some period of time does not render the underlying actions appropriate for multidistrict litigation.

**III. IF THE PANEL GRANTS THE MOTION, NAMASTÉ AND DABUR RECOMMEND ASSIGNMENT TO THE SOUTHERN DISTRICT OF NEW YORK.**

If the Panel nevertheless decides to centralize the underlying actions, Namasté and Dabur respectfully recommend assigning the proceedings in the Southern District of New York. Alternatively, should the Panel prefer to centralize the actions in the Northern District of Illinois, Namasté and Dabur recommend assignment before the Honorable John J. Tharp Jr.

**A. Namasté and Dabur Recommend that the Panel Transfer the Actions to the Honorable Valerie E. Caproni in the Southern District of New York.**

Judge Caproni currently presides over *Terrell v. L'Oréal USA Inc.*, No. 1:22-cv-09008, in the Southern District of New York. *Terrell* is one of the three first-filed hair-relaxer cases filed on October 21, 2022. Moreover, Judge Caproni is an esteemed, experienced, and well-qualified jurist who was appointed to the bench on December 2, 2013. Before her appointment, Judge Caproni held a distinguished career in both the public and private sectors, including serving as the general counsel of the FBI. She also is highly skilled in managing complex litigation—deftly handling the MDLs for *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litigation*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016), and *In re: London Silver Fixing, Ltd., Antitrust Litigation*, 213 F. Supp. 3d 530 (S.D.N.Y. 2016). Given her prior experience, Judge Caproni would be an excellent transferee court for these complicated matters.

In addition, Judge Caproni's chambers are located in Manhattan, which, as this Panel has previously acknowledged, is an "accessible, metropolitan location" that well serves MDLs, particularly so when key parties are located nearby. *In re Rhodia S.A., Sec. Litig.*, 398 F. Supp. 2d 1359, 1360 (J.P.M.L. 2005); *In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,

24 F. Supp. 3d 1361, 1363 (J.P.M.L. 2014). Here, several Defendants are headquartered in the forum. L'Oréal USA, Inc., L'Oréal USA Products, Inc., Revlon, Inc., and Revlon Consumer Products Corporation are all based in New York. L'Oréal's presence in New York is especially valuable given that it is the most common Defendant, being named in eight of the 11 matters. State court litigation is proceeding against L'Oréal in New York as well, making New York a key location for discovery across most matters. Moreover, another Defendant, Soft Sheen, is located close by in Wilmington, Delaware. These factors make the Southern District of New York an ideal venue for the transfer of these cases.

      **B.    Alternatively, Should the Panel Prefer the Northern District of Illinois, Namasté and Dabur Recommend that It Transfer the Actions to the Honorable John J. Tharp Jr.**

As Plaintiffs note, the Northern District of Illinois is a geographically central forum for all Plaintiffs and Defendants and has a wealth of experience in MDLs. It also, currently, hosts the greatest number of hair-relaxer cases in the federal courts. The forum is readily accessible for all interested parties via the Chicago O'Hare International Airport (the fourth most trafficked airport in the world in 2021[4]) and the Chicago Midway International Airport. Accordingly, Namasté and Dabur agree that the Northern District of Illinois is an acceptable forum.

Judge Tharp currently presides over one of the earlier filings in the Northern District of Illinois—*Smith v. L'Oréal USA, Inc.*, No. 1:22-cv-06047. He has served on the bench since 2012 and is a "skilled jurist who has yet had the opportunity to preside over an MDL"—a quality the Panel often looks to in assigning a matter. *In re Rail Freight Fuel Surcharge Antitrust Litig. (No.*

---

[4]    *Press Release: The Top 10 Busiest Airports in the World Revealed*, AIRPORTS COUNCIL INT'L (Apr. 11, 2022), https://aci.aero/2022/04/11/the-top-10-busiest-airports-in-the-world-revealed/.

*II)*, 437 F. Supp. 3d 1365, 1366 (J.P.M.L. 2020); *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368, 1370 (J.P.M.L. 2020). Therefore, should the Panel wish to centralize the matter in the Northern District of Illinois, Namasté and Dabur recommend assignment to the Honorable John J. Tharp Jr.

## CONCLUSION

For the foregoing reasons, the Panel should deny Plaintiffs' motion. If the Panel is inclined to grant the motion, Namasté and Dabur recommend assignment to the Honorable Valerie E. Caproni in the Southern District of New York, or in the alternative, to the Honorable John J. Tharp Jr. in the Northern District of Illinois.

Dated: December 7, 2022

Respectfully submitted,

*/s/ Donna Welch*
Donna Welch, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000
donna.welch@kirkland.com

**COUNSEL FOR DEFENDANTS DABUR INTERNATIONAL LIMITED AND NAMASTÉ LABORATORIES, LLC**